IN THE

# SUPREME COURT OF THE STATE OF ARIZONA

_____

**STATE OF ARIZONA,**
*Appellee,*

*v.*

**DWANDARRIUS JAMAR ROBINSON,**
*Appellant.*

No. CR-18-0284-AP
Filed May 24, 2022

_____

Appeal from the Superior Court in Maricopa County
The Honorable Greg S. Como, Judge
No. CR2012-138236-001
**AFFIRMED**

_____

COUNSEL:

Mark Brnovich, Arizona Attorney General, Joseph T. Maziarz, Chief Counsel, Capital Litigation Section, Sarah E. Heckathorne (argued), David Ahl, Assistant Attorneys General, Phoenix, Attorneys for State of Arizona

Rosemarie Peña-Lynch, Director and Legal Advocate, Kerri L. Chamberlin (argued), Deputy Legal Advocate, Office of the Legal Advocate, Phoenix, Attorneys for Dwandarrius Jamar Robinson

Jared G. Keenan, Arizona Attorneys for Criminal Justice, Phoenix; Joshua D. Bendor, Osborn Maledon, P.A., Phoenix; and Alejandra Curiel-Molina, Kassandra Garcia, Zachary Stern, Kate McFarlane, Sandra Day O'Connor College of Law, Phoenix, Attorneys for Amicus Curiae Arizona Attorneys for Criminal Justice

_____

CHIEF JUSTICE BRUTINEL authored the opinion of the Court, in which VICE CHIEF JUSTICE TIMMER and JUSTICES BOLICK, LOPEZ, BEENE, KING, and JUDGE CRUZ joined.[*]

_____

CHIEF JUSTICE BRUTINEL, opinion of the Court:

¶1 Dwandarrius Jamar Robinson was sentenced to death after a jury found him guilty of two counts of first degree murder, one count of arson of an occupied structure, and one count of kidnapping. We have jurisdiction under article 6, section 5(3) of the Arizona Constitution and A.R.S. §§ 13-4031 and -4033(A). For the following reasons, we affirm Robinson's convictions and sentences.

## I.    BACKGROUND

¶2 On July 18, 2012, Robinson beat, bound, and immolated his nine-months-pregnant girlfriend, Shaniqua Hall ("S.H."), in the master bedroom of their shared apartment, killing both her and their unborn child, Baby Hall ("B.H.").[1] He then placed a 9-1-1 call to report a fire at the apartment, where, upon extinguishing the fire, emergency responders discovered S.H.'s partially burned body lying face down on the bedroom floor with her feet and hands bound, wrists handcuffed, mouth and eyes covered with duct tape, and mouth stuffed with a folded cloth. A search of Robinson's backpack revealed a partially used roll of silver duct tape, an unopened roll of black duct tape, pieces of crumpled duct tape, a grocery bag, a matchbook with at least one match missing, and a receipt reflecting purchases of duct tape and a bottle of lighter fluid earlier that day.[2] Police also found a handcuff key in Robinson's pocket.

¶3 The medical examiner, Dr. John Hu, performed autopsies on both bodies. He determined that S.H.'s death was the result of "homicidal violence," with the manner of death likely being either asphyxia from smothering or strangulation, blunt force trauma, ligature restraint, or some combination thereof. He could not, however, definitively say whether she

_____

[*] Justice William G. Montgomery has recused himself from this case. Pursuant to article 6, section 3 of the Arizona Constitution, Judge Maria Elena Cruz, Judge of the Arizona Court of Appeals, Division One, was designated to sit in this matter.

[1] We review the facts in the light most favorable to sustaining the jury's verdict. *State v. Smith*, 250 Ariz. 69, 78 ¶ 2 n.1 (2020).

[2] Robinson's fingerprints were found on the duct tape and grocery bag.

was alive or dead at the time of the fire. Dr. Hu attributed B.H.'s death to the lack of blood supply caused by S.H.'s death. B.H.'s gestational age was thirty-eight weeks and was thus considered full term.

¶4        On July 24, 2012, a grand jury indicted Robinson on two counts of first degree murder, one count of arson of an occupied structure, and one count of kidnapping. The State noticed its intent to seek the death penalty, alleging a total of seven death-qualifying aggravating circumstances—three as to S.H. and four as to B.H. For six of them, the State listed the same three aggravators as to each murder—specifically, that Robinson had a prior conviction for a serious offense, *see* A.R.S. § 13-751(F)(2) (2009);[3] that he was convicted of one or more homicides committed during the commission of the offense, *see* § 13-751(F)(8); and that he killed each victim in an especially heinous, cruel or depraved manner, *see* § 13-751(F)(6). For the final aggravator, the State alleged that Robinson was an adult and that B.H. was an unborn child at the time of the murder. *See* § 13-751(F)(9).

¶5        The jury trial commenced on January 22, 2018. The jury found Robinson guilty on all four counts and, at the end of the aggravation phase, found all seven aggravators proven beyond a reasonable doubt. During the penalty phase, Robinson put on evidence of the violence, poverty, and abuse that purportedly pervaded his childhood home and hometown. After considering the mitigation evidence, the jury returned death verdicts on both murder counts. The trial court imposed that sentence and, additionally, sentenced Robinson to a concurrent fifteen-year sentence on the arson conviction and a consecutive fifteen-year sentence on the kidnapping conviction.

¶6        Robinson timely appealed. *See* § 13-4031.

## II.        DISCUSSION

### A.        The *Batson* Challenges

¶7        Robinson first takes aim at the State's peremptory strikes of four minority jurors—two of them Black (Jurors 145 and 358), one Hispanic (Juror 260), and one Native American (Juror 300). He argues that the trial court erred in accepting the State's proffered race-neutral reasons for striking each juror. We disagree.

---

[3] Except where otherwise specified, all citations to § 13-751 refer to the 2009 version under which Robinson was indicted.

**¶8**        The Equal Protection Clause of the Fourteenth Amendment "forbids the prosecutor to challenge potential jurors solely on account of their race."[4] *Batson v. Kentucky*, 476 U.S. 79, 89 (1986). "A *Batson* challenge involves three steps: (1) The defendant must make a prima facie showing of discrimination, (2) the prosecutor must offer a race-neutral reason for each strike, and (3) the trial court must determine whether the [defendant] proved purposeful racial discrimination." *Smith*, 250 Ariz. at 86 ¶ 63 (quoting *State v. Medina*, 232 Ariz. 391, 404 ¶ 44 (2013)). Our inquiry here focuses on the third step. We usually defer to the trial court on this "pure issue of fact," (*Dionisio*) *Hernandez v. New York*, 500 U.S. 352, 364 (1991), which almost invariably depends upon an assessment of the prosecutor's credibility, *Smith*, 250 Ariz. at 86 ¶ 62. Our deference is not a rubber stamp. *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) ("Deference does not by definition preclude relief."). We will instead affirm the trial court's determination absent clear error. *Smith*, 250 Ariz. at 86 ¶ 62.

**¶9**        We remain true to *Batson*'s limits. A prosecutor need not justify a challenged strike by satisfying the higher showing required of a challenge for cause. *Batson*, 476 U.S. at 97. *Batson*'s purpose is the prevention of "purposeful discrimination." *See Smith*, 250 Ariz. at 87 ¶ 67. "Discriminatory purpose implies more than intent as volition or intent as awareness of consequences." (*Dionisio*) *Hernandez*, 500 U.S. at 360 (cleaned up). It means acting "because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (internal quotation marks omitted) (quoting *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979)). And the burden of showing such discrimination falls to the challenger. *Smith*, 250 Ariz. at 87 ¶ 67. Thus, absent exceptional circumstances—for instance, where there is "[p]roof of systematic exclusion from the venire," *see Batson*, 476 U.S. at 94, or where the state falls back on threadbare assurances of race-neutrality, *see id.* at 97–98—we will not infer error based on "statistical disparity alone," *see State v. Gay*, 214 Ariz. 214, 221 ¶ 20 (App. 2007); *see also* (*Dionisio*) *Hernandez*, 500 U.S. at 359–60 (noting official action is not unconstitutional based solely on its "racially disproportionate impact"). So long as the state offers a race-neutral explanation, the defendant must prove a discriminatory purpose. *Batson*, 476 U.S. at 98.

---

[4] We have not decided whether the Arizona Constitution grants protection greater than that afforded under *Batson*. *See State v. Superior Court* (*Gardner*), 157 Ariz. 541, 546 n.4 (1988) (declining to decide whether article 2, section 24 of the Arizona Constitution forbids race-based peremptory strikes). Robinson does not ask us to do so here, so we apply the federal standard.

¶10        We are equally mindful of *Batson*'s blind spots.  We are under no illusion that *Batson* somehow served to "end the racial discrimination that peremptories inject into the jury-selection process."   *See* 476 U.S. at 102–03 (Marshall, J., concurring).  But it is not our place to augment the Supreme Court's enshrinement of what remains a federal constitutional protection.  We accordingly eschew Robinson's and amici's invitations to shore up *Batson*'s arguable shortcomings and instead limit our review to each of the trial court's determinations.

1.        Juror 145

¶11        The trial court did not clearly err in denying Robinson's *Batson* challenge to the State's peremptory strike of Juror 145.    The prosecutor provided the following explanation for the State's strike:

> He indicated -- when he was being questioned about the ability to impose the death penalty, he said: It is terrifying for me to consider what we are even talking about.
>
> That alone was of concern to the State. He did indicate that he did feel the death penalty could be appropriate, but that this decision terrifies him. And that is of great concern to the State.

Robinson's trial counsel did not respond directly to these reasons at trial but instead drew the trial court's attention to the racial makeup of the jury if all four strikes were permitted to stand.  On appeal, however, Robinson calls the justification "demonstrably pretextual" because of its deliberate misconstruction of Juror 145's responses to voir dire questioning.  Not so.

¶12        In fact, the prosecutor recapped Juror 145's words almost verbatim.  Juror 145 had told defense counsel that it was "terrifying to consider what we're talking about" — that "what" being the choice between the death penalty and a life sentence.  Juror 145 did also say that imposing death "could be appropriate," and responded, "Sure," when asked whether he could do so.  None of which, however, denotes pretext.  The prosecutor's own explanation acknowledged Juror 145's stated open-mindedness.  Granted, Robinson's more favorable characterization of Juror 145's statements as an "acknowledgment of the seriousness of a capital case and the imposition of the death penalty" presents a valid perspective, just not the only one.  The State was no less justified in construing the same words as an expression of hesitancy toward, or personal discomfort with, the idea of imposing the death penalty — a quality the prosecutor understandably hoped to avoid.  But reasonably divergent views of the same record do not denote prosecutorial dissembling.  At most, they explain the State's

selection of a peremptory strike in lieu of a challenge for cause. *See Batson*, 476 U.S. at 97.

¶13 It follows that the trial court did not err in accepting the prosecutor's reasons. The court assessed those reasons "in light of all of the relevant facts and circumstances, and in light of the arguments of the parties." *See Flowers v. Mississippi*, 139 S. Ct. 2228, 2243 (2019). It credited those arguments' rationality, considered the strikes' overall impact on the jury panel's racial makeup, and observed the good faith demonstrated by counsel for both parties during voir dire. *See State v. Gallardo*, 225 Ariz. 560, 565 ¶ 13 (2010) ("Other minority jurors were ultimately selected for the panel, and although not dispositive, the fact that the state accepted other minority jurors on the venire is indicative of a nondiscriminatory motive." (internal brackets and quotation marks omitted)). The court also noted that "[t]here were a number of jurors that could have potentially been challenged for cause, minority jurors, that were not challenged for cause by the State or, for that matter, by the defense." All told, the court saw no reason to doubt the prosecutor's sincerity, and neither do we.

¶14 Amici's call for a comparative analysis of Juror 145 vis-à-vis Juror 64—a White juror who apparently showed similar hesitation about the death penalty—comes too little, too late. Robinson neither raises this argument himself on appeal, nor, more importantly, did he do so below. Thus, the State had no chance to distinguish between these jurors, and the trial court had no opportunity to address them in the first instance. *See State v. Escalante-Orozco*, 241 Ariz. 254, 272 ¶ 37 (2017), *abrogated on other grounds by State v. Escalante*, 245 Ariz. 135 (2018). While relevant where properly raised, such comparative analyses cannot be raised for the first time on appeal. *See Smith*, 250 Ariz. at 88 ¶ 71. We accordingly treat the argument as waived as to each *Batson* challenge, *see id.* (collecting cases), and we affirm the trial court's decision upholding Juror 145's dismissal.

### 2. Juror 358

¶15 We reach the same conclusion as to Juror 358. In defending its use of a peremptory strike there, the prosecutor offered this explanation:

> Judge, on [Juror] 358, specifically, she was treated unfairly by the police when they pulled her over.
>
> But the one more concerning for the State is that she said that she must have DNA or a witness when it comes to the evidence that she wants. And in our case, as the Court knows,

the DNA is really hit or miss. And we don't have an eyewitness. It's a circumstantial case.

And she also wants video. It was actually, I believe, video, a witness, or DNA was what she said kind of the State had to have in its case, all three, which we're lacking, which goes heavily towards a guilt determination in this case, Judge.

The prosecutor also expressed apprehension about Juror 358's apparent anxiety issues. Robinson's trial counsel offered no direct rebuttal to these reasons below; however, on appeal, Robinson again accuses the prosecutor of misstating Juror 358's voir dire responses. He does so in vain.

¶16 First, Juror 358's negative experience with law enforcement lends at least some support to the State's decision to strike her. *See State v. Roque*, 213 Ariz. 193, 204 ¶ 15 (2006) ("Antipathy toward the police alone may constitute a valid reason to strike jurors when the State's case relies on police testimony."), *abrogated on other grounds by Escalante-Orozco*, *supra*. In addition to responding "Yes" to the question about prior instances of being "treated unfairly in the past by someone in law enforcement," Juror 358 described her experience as "[r]acial profiling by cops pulling over the car assuming we did not own it or live in my area." Robinson rightly notes that she also responded "No" to the questionnaire's subsequent query about harboring "any hostility, bitterness, frustration, or negative feelings toward [police]." Had this been a challenge for cause, perhaps that would have insulated Juror 358 from excusal. Such uncertainty does not, however, render the prosecutor's stated concern about Juror 358's own experience with law enforcement, upon whose testimony the prosecutor would be relying at trial, "clearly pretextual." *See id.*

¶17 Second, Juror 358's questionnaire responses did indicate a preference for more than circumstantial evidence. Once more, Robinson and amici correctly point out that Juror 358 responded "No" to whether proof beyond a reasonable doubt requires the State to produce "scientific evidence, such as DNA or fingerprint evidence," or to present "eyewitness testimony or a confession of guilt." Nevertheless, her explanations tend to validate the State's concern that circumstantial evidence might not be enough for her. Regarding scientific evidence, Juror 358 wrote: "It would help prove the case[;] however, if witness saw the crime or there is video this can impact my thoughts." As to eyewitness testimony or confessions, she added: "If there is video or DNA take [sic] can change my view." Read together, these responses reasonably suggest that, though perhaps she

7

didn't require both scientific evidence and eyewitness testimony, a video or a confession, she did prefer one or the other.

¶18 Of course, the prosecutor's use of words like "must" and "had to have" cast Juror 358's responses as more categorical than they were. But these expected embellishments while paraphrasing stop well short of the outright fabrications typical of purposeful discrimination. *See Flowers*, 139 S. Ct. at 2250 ("To be sure, the back and forth of a *Batson* hearing can be hurried, and prosecutors can make mistakes when providing explanations. That is entirely understandable, and mistaken explanations should not be confused with racial discrimination."); *cf. Miller-El v. Dretke*, 545 U.S. 231, 244 (2005) (rejecting race-neutral reason where "[prosecutor] represented that [juror] said he would not vote for death if rehabilitation was possible, whereas [juror] unequivocally stated that he could impose the death penalty regardless of the possibility of rehabilitation"). Read as a whole, Juror 358's questionnaire responses lend ample support to the prosecutor's perspective and, by extension, give us no reason to second-guess the trial court's credibility assessment. *See Escalante-Orozco*, 241 Ariz. at 272 ¶ 36; *see also Kirkland v. State*, 726 S.E.2d 644, 649 (Ga. Ct. App. 2012) (concluding it was race-neutral to strike juror for "stat[ing] that forensic evidence would be helpful to establish a defendant's guilt in this case").

¶19 Third, and finally, the record supports the prosecutor's stated concerns about Juror 358's anxiety. *Cf. State v. Newell*, 212 Ariz. 389, 401 ¶ 54 (2006) ("In determining whether the defendant has proven purposeful discrimination, 'implausible or fantastic justifications may (and probably will) be found to be pretext[ual].'" (quoting *Purkett v. Elem*, 514 U.S. 765, 768 (1995))). Juror 358's questionnaire indicated she "had an anxiety attack in the past" and had been prescribed Xanax. The prosecutor said Juror 358's anxiety posed a concern because the State "had to excuse a juror who was having anxiety issues" in another capital murder case. It is true, as Robinson and amici note, that Juror 358 denied taking any medication or having a condition that might affect her ability to serve as a juror. Yet the absence of an impairing medication or condition does not render fantastical the prosecutor's concerns about the potential disruptiveness of her admitted anxiety and, thus, does not denote a discriminatory purpose. *See id.*

¶20 Robinson and amici misplace their reliance on caselaw inferring discriminatory intent from inadequate follow-up questioning. In *Dretke*, for instance, the Supreme Court did cite such a deficit in discrediting a prosecutor's stated concern with the prior conviction of a Black juror's brother—but in an entirely non-analogous context. 545 U.S. at 246. The

prosecutor there had initially offered personal opposition to the death penalty as a race-neutral reason for striking that juror. *Id.* at 244. When that reason proved a fabrication, the prosecutor abandoned it and cited the brother's conviction. *Id.* at 246. The Court next considered the context of this "substitute reason," including its "pretextual timing," the juror's own voir dire testimony that he and his brother weren't close, and the prosecutor's failure to inquire further into this alternative justification. *Id.* All of which indicated that reason's implausibility. *Id.* The Court's decision in *Flowers* followed a similar trajectory. There the Court contrasted the prosecutor's failure to ask White jurors about their connections to witnesses with the prosecutor's apparent preoccupation with striking a Black juror on the same basis. *See Flowers*, 139 S. Ct. at 2249–50. Considered alongside the same prosecutor's "pattern of factually inaccurate statements about [B]lack prospective jurors," history of questionable strikes in earlier trials, and decision to strike five of the six Black jurors on the panel, the prosecutor's lopsided focus on questioning Black jurors was impossible to ignore. *See id.* at 2250.

**¶21** The trial court did not clearly err in upholding the State's peremptory strike of Juror 358. The court considered the broader relevant context, including the reasonableness of the prosecutor's stated concerns, the racial makeup of the jury panel before and after the State's peremptory strikes, as well as the good faith shown by counsel throughout voir dire. *Cf. id.* at 2243 (listing several examples of factors the court may consider). The prosecutor here did not engage in the kind of whack-a-mole explanations observed in *Dretke* or *Flowers*. Aside from a mild misstatement of Juror 358's preference for scientific evidence, the record overall vindicates the prosecutor's concerns. *See id.* at 2250. We affirm.

### 3.      Juror 260

**¶22** We also affirm the State's peremptory strike of Juror 260. The prosecutor responded to Robinson's *Batson* challenge as follows:

> Judge, this was the individual who indicated that he was writing letters through a letter program, sharing the gospel with individuals in church. He had indicated he wasn't getting responses until, I think he indicated, either since the time he filled out the questionnaire -- he said something about receiving a letter in response recently.

> But he indicated it was his mission -- or part of that mission
> to give inmates uplift, to say hello, to share the message of the
> gospel and the messages they might like.
>
> He felt time -- he said he felt the laws -- wow. Was a time he
> felt laws were too harsh in this state. He indicated he has
> problems with people sentenced to the death penalty, only to
> find out later a person was innocent of the crime. He had some
> confusion regarding the burden of proof.

Once again, Robinson's trial counsel did not directly rebut the prosecutor's explanation. And once more on appeal, he says the State "distorted the record" by failing to note Juror 260's currently favorable view of Arizona's criminal laws, the prosecutor's amelioration of any initial confusion about the burdens of proof for aggravation and mitigation, and the triviality of Juror 260's involvement in the letter writing program. We disagree.

**¶23** *Batson* does not compel a prosecutor to furnish a complete pros and cons list for each peremptory strike—only a race-neutral reason. 476 U.S. at 98. The State's concern that Juror 260's prior distaste for Arizona's criminal laws and experience corresponding with inmates might make him sympathetic to Robinson was enough. *See State v. (Antonio G.) Hernandez*, 170 Ariz. 301, 305–06 (App. 1991) ("As long as it is not based upon race, perceived sympathy on the part of a prospective juror toward a defendant is a legitimate basis for a peremptory strike." (internal citation omitted)); *accord State v. Butler*, 230 Ariz. 465, 475 ¶¶ 41–43 (App. 2012) (affirming strike of drug counselor based on potential sympathy for defendant even though prosecutor struck the only two Black jurors). And neither the slim odds of success in striking Juror 260 for cause nor the existence of competing perspectives on the same facts, however reasonable, necessarily compromises the integrity of that reason. *See Batson*, 476 U.S. at 97; *cf. State v. Lucas*, 199 Ariz. 366, 369 ¶ 11 (App. 2001) ("Once a discriminatory reason has been uncovered—either inherent or pretextual— this reason taints any other neutral reason for the strike." (internal quotation marks omitted) (quoting *Payton v. Kearse*, 495 S.E.2d 205, 210 (S.C. 1998))).

**¶24** In sum, it was not clear error for the trial court to credit the State's stated concerns as race-neutral and, after uncovering no indicia of prosecutorial duplicity, to deny Robinson's *Batson* challenge. The court weighed the strikes against the totality of the relevant circumstances and deemed the prosecutor credible. *See Flowers*, 139 S. Ct. at 2243. We affirm.

### 4.    Juror 300

¶25    Similar considerations support the State's strike of Juror 300. The prosecutor offered the following explanation in response to Robinson's *Batson* challenge:

> She was similar to another juror that says she believes that all people are good and have good morals, and that's her starting point. She indicated that life -- she had some issues with life in prison, that it should not be a way of life, but that some people can make a life in prison.
>
> But she clearly had issues, indicating that we are all ingrained -- and this is her words -- we are all ingrained to do morally good, even in the worst conditions. And that is her starting belief.
>
> She has relatives who have been in prison, she said in the '60s at one point and at the '70s on another point. She -- I believe she had a stepson who was charged with a sexual assault-related offense. She said the photos may be an issue for her, under Question 77. She indicated that it would be hard for her. She did say that she felt it was a necessity, but it would be a hard decision for her whether or not she could impose the death penalty.
>
> She said that crime is -- committing crime is not the core of any one of us. You have to be conditioned to do it.

In this instance, however, Robinson's trial counsel offered a direct rebuttal:

> Now -- and as far as the strikes, as to [Juror] No. 300, the only thing I would like to say about that, I believe that the only thing I heard was that this was a juror who just basically said that they believed in people being good and that that was the reason to strike. So I would still say that that was just a pretext.

¶26    On appeal, Robinson shifts his focus to the prosecutor's suggestion that Juror 300 would have some difficulty imposing the death penalty. Relying on questionnaire and voir dire responses said to indicate the opposite, Robinson insists the prosecutor's reasoning can only be described as pretext. But the record isn't so unequivocal.

¶27        The State does not dispute Juror 300's stated willingness to impose the death penalty.  And rightly so.  The record confirms Juror 300 neither opposed nor preferred the death penalty, held no fundamental opposition to its imposition, and felt personally capable of returning a death verdict.  The State instead refers us to other concerns mentioned by the prosecutor—most notably, Juror 300's belief that "all of us have good morals," and that criminal behavior "may be something that has been conditioned."  In its view, these beliefs' potential interference with Juror 300's ability to accept Robinson's guilt or moral culpability provided a race-neutral reason for striking her.  We agree.

¶28        The prosecutor's concern that Juror 300 might come to credit Robinson's unenviable childhood for S.H.'s and B.H.'s murders provides a legitimate basis for exercising a peremptory strike.  *See* (*Antonio G.*) *Hernandez*, 170 Ariz. at 305–06 (affirming peremptory strike for perceived sympathy toward a defendant); *see also State v. Krebs*, 452 P.3d 609, 633 (Cal. 2019) (concluding it was "sound trial strategy" to strike juror "receptive" to expected argument that defendant "did not deserve the death penalty because he suffered childhood abuse, alcoholism, and mental illnesses").  Her relatives' prior criminal convictions provide an additional race-neutral rationale.[5]  *See United States v. Vaccaro*, 816 F.2d 443, 457 (9th Cir. 1987) (determining it "proper" to strike juror with brother in prison for robbery conviction), *abrogated on other grounds by Huddleston v. United States*, 485 U.S. 681 (1988); *accord Edmonds v. State*, 812 A.2d 1034, 1045 (Md. 2002) ("Courts throughout the country have accepted as race-neutral reasons the fact that a venireperson's relative has been convicted of a crime.").  As does her admitted discomfort with graphic photographs.[6]  *See Gay*, 214 Ariz. at 220–21 ¶¶ 18–19 (concluding it was race-neutral to strike juror who, among other things, "had problems with graphic details and gruesome photos").

¶29        The record corroborates these reasons, limiting whatever pretextual inference we might otherwise have expected the trial court to glean from the prosecutor's overstatement.  This is especially true where,

_____

[5] Juror 300's stepson, stepdaughter, and brother had previously been convicted of sexual assault, driving under the influence, and assault, respectively.

[6] On her questionnaire, Juror 300 responded "Yes" when asked whether viewing autopsy and other graphic photos would affect her ability to serve as a fair and impartial juror, adding that "photographs do not state the defendant committed the crime."  During voir dire, she told the prosecutor that "[n]atural reaction, it's going to be hard [to view graphic photographs], but maybe necessary to come to a conclusion effectively."

as here, the misattribution is mere difficulty with the decision, not outright opposition to the form of punishment. *Cf. Dretke*, 545 U.S. at 246–47 (giving weight to juror's affirmation of willingness to impose death penalty despite his prior statements in support of rehabilitation). Willingness to impose the death penalty does not negate possible apprehension. Nor, more importantly, does it detract from the overall accuracy of the prosecutor's account of Juror 300's voir dire responses. To the extent the prosecutor misstated those responses, we find it "entirely understandable." *Flowers*, 139 S. Ct. at 2250. The State's decision not to challenge Juror 300 for cause likewise says little about the prosecutor's probable motive. Nor was the prosecutor obliged to offer an explanation on par with such a challenge. *See Batson*, 476 U.S. at 97.

¶30 The trial court did not clearly err in accepting the prosecutor's stated reasons for striking Juror 300. After assessing the strikes against all the relevant circumstances, the court found no reason to doubt the prosecutor's sincerity. *See Flowers*, 139 S. Ct. at 2243. Robinson has not shown an error in the court's analysis. Therefore, we affirm.

### B. The F(6) Aggravator

¶31 Robinson next attacks the jury's findings that he murdered S.H. and B.H. in an especially cruel, heinous or depraved manner. Because both murders occurred after August 1, 2002, we do not independently review the jury's finding; instead, we ask whether the jury abused its discretion. A.R.S. § 13-756(A). We accordingly review the record for substantial evidence, viewing the evidence in the light most favorable to sustaining its verdict. *State v. Gunches*, 225 Ariz. 22, 25 ¶ 14 (2010). "Substantial evidence is such proof that reasonable persons could accept as adequate and sufficient to support a conclusion of [the] defendant's guilt beyond a reasonable doubt." *Id.* (quoting *Roque*, 213 Ariz. at 218 ¶ 93).

¶32 Section 13-751(F)(6) provides that a first degree murder is aggravated if "[t]he defendant committed the offense in an especially heinous, cruel or depraved manner." The elements in § 13-751(F)(6) are disjunctive, and we will uphold an (F)(6) finding if one or more are proven. *State v. (Shawn P.) Lynch*, 225 Ariz. 27, 41 ¶ 77 (2010). The terms "heinous or depraved," though worded disjunctively, constitute just one prong of the (F)(6) aggravator. *State v. Womble*, 225 Ariz. 91, 100 ¶ 34 (2010). Here, the jury found that S.H.'s murder was both especially cruel and especially heinous or depraved, and that B.H.'s murder was especially heinous or depraved. We address each finding in turn.

1.     Especially cruel (S.H.)

**¶33**     "A murder is especially cruel when 'the victim consciously experienced physical or mental pain prior to death, and the defendant knew or should have known that suffering would occur.'" (*Shawn P.*) *Lynch*, 225 Ariz. at 41 ¶ 78 (quoting *State v. Trostle*, 191 Ariz. 4, 18 (1997)).  This does not mean the victim must have been conscious for every wound inflicted, or that her suffering must have lasted for some specified amount of time. *State v. Goudeau*, 239 Ariz. 421, 463 ¶ 184 (2016).  Mental pain or anguish includes the victim's uncertainty about her fate and may be supported by evidence of pleas or defensive injuries. *Id.* at 463–64 ¶ 184.  We accordingly assess this aggravator by evaluating "the entire murder transaction, not merely the fatal act."  *Id.* at 464 ¶ 184.

**¶34**     Substantial evidence supports the jury's finding that S.H.'s murder was especially cruel.  Robinson forced S.H., who was nine months pregnant, into a facedown position and restrained her with handcuffs behind her back.  He used a combination of knotted neckties and duct tape to bind her ankles together.  He stuffed a folded cloth into her mouth, obstructing her ability to breathe.  And he placed duct tape over her mouth and eyes.  Dr. Hu's autopsy in turn revealed "extensive" eye hemorrhaging suggestive of strangulation, as well as blood, saliva, and teeth marks on the cloth and tongue, indicating S.H. was still alive after the cloth's insertion.

**¶35**     These facts provide plentiful support for the jury's conclusion that S.H. consciously suffered before her death and that Robinson knew or should have known such suffering would occur.  We have repeatedly noted that one generally does not restrain someone who is already unconscious. *See State v.* (*Robert*) *Hernandez*, 232 Ariz. 313, 325 ¶ 57 (2013) ("While bound, [the victim] would have been uncertain as to her fate, and thus suffered the requisite mental anguish necessary for the 'especially cruel' finding required by § 13-751(F)(6)." (internal citation omitted)); *State v. Parker*, 231 Ariz. 391, 410 ¶ 88 (2013) ("[T]hat [the victim] was bound supports a finding that she was conscious, and so would have suffered mental anguish."); *Gallardo*, 225 Ariz. at 565–66 ¶ 17 ("[The victim] almost certainly was conscious when bound, as there is no reason to bind an unconscious person."); (*Shawn P.*) *Lynch,* 225 Ariz. at 41 ¶¶ 79–80 ("[The victim] was almost surely conscious when bound to the chair, as there is no reason to bind an unconscious person who offers no resistance. . . .  [I]t was surely foreseeable that [the victim] would suffer significant mental anguish while being bound to the chair." (internal citations omitted) (internal quotation marks and modifications omitted)); *State v. Bible*, 175 Ariz. 549, 604–05 (1993) ("The fact that [the victim's] hands were bound indicates that she

was conscious and tied-up to prevent struggling."). The great lengths to which Robinson went to bind, gag, blindfold, and restrain S.H. further suggest she "had ample time to suffer 'significant uncertainty as to [her] ultimate fate.'" *See* (*Shawn P.*) *Lynch*, 225 Ariz. at 41 ¶ 79 (quoting *State v. Van Adams*, 194 Ariz. 408, 421 ¶ 44 (1999)); *see also Gallardo*, 225 Ariz. at 566 ¶ 19 ("That [the victim] was bound hand and foot, a pillowcase was tied over his head, and he struggled to free himself also indicates he had time to suffer significant uncertainty as to his fate."). Additionally, the obstructed airway, blood- and saliva-soaked cloth, and bite marks on the cloth and tongue together suggest S.H. struggled for breath, even if for no more than a few minutes,[7] after Robinson stuffed the cloth into her mouth. *See Goudeau*, 239 Ariz. at 463 ¶ 184 (stating there is no minimum time limit for victim suffering).

¶**36** The uncertain order of S.H.'s injuries fails to alter our view. Even were we to ignore both medical experts' descriptions of S.H.'s head injuries as "mild," Robinson's suggestion that "just one of the blunt force injuries" to S.H.'s head could have rendered her unconscious fails to negate all the evidence to the contrary. Thus, the jury did not abuse its discretion in discounting Robinson's competing theory that S.H. was unconscious throughout the encounter.

¶**37** Robinson's distinctions from our previous decisions are similarly unpersuasive. To be sure, we have credited evidence of a prolonged struggle or confrontation in support of an especially cruel finding. *See, e.g.*, *State v. Prince*, 226 Ariz. 516, 540 ¶¶ 99–101 (2011) (victim witnessed mother being beaten, threatened at gunpoint, attempted to escape, and appeared frightened before being shot by defendant). This notably includes many of the same cases in which the victim was eventually bound. *See* (*Robert*) *Hernandez*, 232 Ariz. at 325 ¶ 57 (victim forced into home at gunpoint and heard other victims' screams); *Parker*, 231 Ariz. at 410 ¶ 88 (knife wounds to victim's hand and face); *Gallardo*, 225 Ariz. at 566 ¶¶ 18–19 (victim "struggled to free himself" from restraints); (*Shawn P.*) *Lynch*, 225 Ariz. at 41 ¶ 79 (ligatures, abrasions, and bruising on victim's body). However, we have never held such a struggle to be necessary. *See Prince*, 226 Ariz. at 540 ¶ 102 ("[L]ater cases clearly establish that the victim's uncertainty is a sufficient, but not necessary, basis for a finding of especial cruelty."). To the contrary, we have regularly credited the use of restraints as a reliable indicator of victim consciousness and suffering. *See,*

---

[7] At trial, both parties' experts agreed that S.H. would have passed away from asphyxiation within a few minutes of the cloth being stuffed in her mouth.

*e.g.*, *Gallardo*, 225 Ariz. at 565–66 ¶ 17; (*Shawn P.*) *Lynch*, 225 Ariz. at 41 ¶¶ 79–80.  We therefore affirm the jury's especial cruelty finding here.

2.      Especially heinous or depraved (S.H.)

**¶38**      The (F)(6) aggravator's "especially heinous or depraved" element asks a different question.  Unlike its "especially cruel" counterpart, which considers the victim's state of mind, the term "heinous or depraved" focuses on that of the defendant.  *State v. Murdaugh*, 209 Ariz. 19, 31 ¶ 59 (2004).  This is generally assessed by reference to the defendant's words or actions both preceding and during the crime's commission.  *Id.*  Specifically, the jury must consider "1) whether the defendant relished the murder; 2) whether the defendant inflicted gratuitous violence on the victim; 3) whether the defendant needlessly mutilated the victim; 4) the senselessness of the crime; and 5) the helplessness of the victim."  *Id.*

**¶39**      The State's argument as to S.H.'s murder focuses primarily on Robinson's use of fire.[8]  It raises two competing theories, each depending upon the timing of S.H.'s death.  If Robinson set S.H. on fire while she was still alive, doing so was gratuitously violent given his prior infliction of a fatal injury—namely, by obstructing her airway and binding her body, giving her no more than a few minutes to live.  Otherwise, setting her on fire constituted needless mutilation.  Robinson insists that the combined effect of the uncertain timing of S.H.'s death and a lack of evidence as to his state of mind at the time bars both findings.  We disagree.

**¶40**      We begin by clarifying that alternative arguments are not the same as alternative findings.  Robinson rightly states that alternative findings cannot be used to find an (F)(6) aggravator proven beyond a reasonable doubt.  *State v. Soto-Fong*, 187 Ariz. 186, 201 (1996).  Specifically, a jury may not, upon finding itself unable to choose between competing factual findings, find the aggravator proven based on "alternative, hypothetical findings."  *Id.* at 201–02.  Conversely, where a jury could reasonably credit one of two possible facts—here, S.H. died either before or after Robinson set her on fire—nothing prevents the prosecutor from presenting a theory for each possible finding.  As we observed in *Soto-Fong*, permitting a factfinder to make alternative findings would likely

---

[8] We do not address the State's conclusory suggestion that Robinson's decision to murder S.H. even after he learned that she had begun having contractions alone suffices to affirm the jury's especially heinous or depraved finding.  The jury was only instructed on gratuitous violence and needless mutilation regarding this factor's application to S.H.'s murder.

16

unconstitutionally reduce the State's burden to prove all aggravators beyond a reasonable doubt. *Id.* at 202. But the same does not follow for a prosecutor's alternative summations of a case. Where the evidence leaves the jury with competing factual possibilities, the prosecutor may present alternative theories of an aggravator's presence, and, provided it resolves the factual question, the jury may decide whether the relevant theory proves the aggravator beyond a reasonable doubt. *See State v. (James C.) Johnson*, 247 Ariz. 166, 183 ¶ 31 (2019) ("Either [the victim] was alive when [the defendant] carved into her stomach, establishing gratuitous violence, or she was already dead, resulting in mutilation.").

**¶41** This subtle distinction proves dispositive. The trial court instructed the jury that to find S.H.'s murder especially heinous or depraved, the State had to prove "at least one" of two actions beyond a reasonable doubt—namely, that Robinson "1. Inflicted gratuitous violence on the victim (Shaniqua Hall) beyond that necessary to kill; **or** 2. Needlessly mutilated the victim's (Shaniqua Hall) body." The plain language of this instruction necessarily forbade the jury from finding the aggravator proven based on a mere consensus that one or the other must have occurred. *Cf. Soto-Fong*, 187 Ariz. at 201–02. Instead, its disjunctive structure and use of the phrase "at least one" required unanimity on the order of events—that is, either gratuitous violence or needless mutilation—as a precondition to finding the aggravator proven beyond a reasonable doubt. Finding no evidence to the contrary, we presume the jury followed the court's instructions. *Newell*, 212 Ariz. at 403 ¶ 68. However, because the verdict form does not specify which of the two actions the jury found here, we review the evidence supporting each.

**¶42** Substantial evidence would have permitted the jury to find that Robinson inflicted gratuitous violence on S.H. *See Gunches*, 225 Ariz. at 25 ¶ 14. "Gratuitous violence can be found if the defendant '(1) inflicted more violence than that necessary to kill, and (2) continued to inflict violence after he knew or should have known that a fatal action had occurred.'" *State v. Rushing*, 243 Ariz. 212, 220 ¶ 33 (2017) (emphasis omitted) (quoting *Gunches*, 225 Ariz. at 25–26 ¶ 16). Both parties' medical experts agreed S.H. would have died of asphyxiation within a few minutes of Robinson stuffing the cloth into her mouth. It follows that setting S.H. on fire was not necessary to ensure her death, and to the extent the jury so found, it was not an abuse of discretion to conclude that Robinson should have known that. *See (James C.) Johnson*, 247 Ariz. at 183 ¶ 30 (finding defendant should have known carving into victim's stomach was unnecessary after making multiple cuts, including one four inches deep, into victim's neck); *cf. State v. Bocharski*, 218 Ariz. 476, 495 ¶ 90 (2008)

(concluding mens rea not established where defendant "used only a knife to inflict the wounds and completed his attack very rapidly"). There was no need for additional evidence of Robinson's state of mind at the time he started the fire.

¶43 Furthermore, unlike especial cruelty, the uncertain timing of S.H.'s death is irrelevant to the existence of gratuitous violence. If S.H. predeceased the fire's ignition, that fact only tends to reinforce the conclusion that setting the fire was not integral to her death. And if she was still alive, the medical consensus remains that asphyxiation followed within minutes of Robinson stuffing the rag into her mouth and blocking her airways. In either scenario, the jury would not have abused its discretion in finding Robinson inflicted gratuitous violence.

¶44 We reach the same result regarding needless mutilation. "Mutilation requires a finding of a separate purpose to mutilate." *State v. Carlson*, 202 Ariz. 570, 584 ¶ 52 (2002). This finding may be supported by evidence giving "some indication" of such a purpose. *State v. Medina*, 193 Ariz. 504, 514 ¶ 38 (1999). Surely dousing S.H. with lighter fluid and setting her on fire after having already inflicted a fatal wound is indicative enough. *See State v. Spencer*, 176 Ariz. 36, 44 (1993) (dousing victim with accelerant and setting her on fire after raping and stabbing her was needless mutilation). The prosecutor's suggestion during closing argument that Robinson set the fire to "erase all the evidence left behind," while perhaps unilluminating as to mutilative purpose, does not prevent such a finding. One may choose to mutilate a corpse in hopes of evading detection just as readily as he does so to relish his actions or put them on display. We find nothing about dousing a victim's body with accelerant and lighting it on fire that categorically distinguishes it from other mutilative acts, such as carving or dismembering. *See, e.g.*, *State v. Pandeli* (*Pandeli I*), 200 Ariz. 365, 375–76 ¶¶ 40–41 (2001) (deeming it needless mutilation to excise both of victim's breasts after her death), *vacated on other grounds*, 536 U.S. 953 (2002). The jury did not abuse its discretion in finding needless mutilation here.

### 3. Especially heinous or depraved (B.H.)

¶45 Robinson also challenges the jury's (F)(6) finding as to B.H.'s murder. At trial, the State's argument for finding this aggravator focused on the "senselessness of the crime" and "helplessness of the victim" factors. *See Murdaugh*, 209 Ariz. at 31 ¶ 59. "The killing of a child satisfies the senselessness and helplessness factors." *State v. Leteve*, 237 Ariz. 516, 527 ¶ 36 (2015). We nevertheless require more than these two factors

to affirm an (F)(6) finding. *Id.* At trial, the State found that additional support in the alleged parent-child relationship Robinson had with B.H.—a relationship that, when combined with a murder's senselessness and a victim's helplessness, provides a "constitutionally permissible" basis for such a finding.[9] *Id.* ¶¶ 37–38 (quoting *Carlson*, 202 Ariz. at 584 ¶ 55).

**¶46** Robinson makes three arguments on appeal.[10] First, he insists that "mere biological paternity" cannot create what he calls a "parental relationship of trust" with a fetus.[11] Second, Robinson suggests fetal status is not enough to support the finding that B.H.'s murder was senseless. Third, and alternatively, he argues that considering fetal status here constituted impermissible double-counting of B.H.'s age given the jury's consideration of the same fact in finding the (F)(9) factor proven beyond a reasonable doubt. We disagree.

a. *Parent-child relationship*

**¶47** We note at the outset Robinson's mischaracterization of the required relationship as a "parental or caregiver relationship of trust." In fact, a parent-child relationship is enough. *See Carlson*, 202 Ariz. at 584 ("The parent/child relationship is a circumstance that separates infanticide from the 'norm' of first-degree murders. The use of that relationship in partial support of a finding of heinousness and depravity is constitutionally permissible." (alterations omitted) (quoting *State v. Milke*, 177 Ariz. 118, 126 (1993)); *cf. State v. Styers*, 177 Ariz. 104, 116 (1993) ("Although there was no legal 'parent/child' relationship, defendant and victim did share a special relationship in that defendant was the child's full-time caregiver for several months before he killed him."). Granted, the exploitation of parental trust has at times informed our analysis. *See, e.g.*, *State v. Fulminante*, 161 Ariz.

---

[9] The trial court properly instructed the jury that the State had to prove all three factors—namely, senselessness, helplessness, and parent-child relationship—beyond a reasonable doubt to support an (F)(6) finding.

[10] Robinson does not dispute B.H.'s helplessness.

[11] Robinson argues for the first time on appeal that the State presented no evidence establishing that he was B.H.'s father. The trial court found that the evidence presented at the *Chronis* hearing had established his paternity, and at trial, the State elicited witness testimony that Robinson was B.H.'s biological father and told the jury that paternity was undisputed—all without objection from Robinson's trial counsel. We accordingly find the argument to be waived. *See State v. Schaaf*, 169 Ariz. 323, 332 (1991) (stating that failure to timely object below waives right to raise argument on appeal).

237, 256 (1988) (finding heinous or depraved conduct in killing of stepdaughter-victim "under parental control and capable of manipulation by" stepfather-defendant).  But we have never treated trust as an essential element of parenthood.  After all, trust typically goes to helplessness, which Robinson does not challenge here.  *See Milke*, 177 Ariz. at 125 (determining child's trust of defendant supported helplessness factor).

**¶48**      The parent-child relationship, by contrast, concerns the "familial" ties shared by defendant and victim.  *See Carlson*, 202 Ariz. at 584 ¶ 53.  Robinson offers no principled basis for us to exclude biological ties from this category.  Indeed, to do so would be inconsistent with the basic definition of family.  *See Family*, Black's Law Dictionary (11th ed. 2019) ("A group of persons connected by blood, by affinity, or by law, esp. within two or three generations.").  Murdering one's own child violates the basic conception of family, no matter its formative origin.  As we have held, it denotes a level of debasement that, when combined with the victim's helplessness and the murder's senselessness, suffices to find a murder especially heinous or depraved.  *See Milke*, 177 Ariz. at 126 ("A mother's conspiracy to murder her own four-year-old child and the resultant premeditated murder of that child is the ultimate perversion of the parent/child relationship."); *State v. Stanley*, 167 Ariz. 519, 529 (1991) ("When a father kills his own child, his actions cannot be characterized as sensible, nor can his state of mind be considered other than perverted. This fact sets this crime apart from the norm of first-degree murders and warrants a finding that the murder was committed in an especially depraved manner."); *State v. Knapp*, 114 Ariz. 531, 543 (1977) (dousing defendant's "own two infant daughters" with lighter fluid and igniting their bedroom "falls squarely within" aggravator).  The trial court properly observed the same distinction below.

**¶49**      We are not swayed by Robinson's analogy to our family law jurisprudence.  The unrelated rule that an unwed father generally lacks constitutionally enforceable parental rights or responsibilities "unless he takes significant steps to create a parental relationship" does not readily apply to capital murder cases.  *See In re Pima Cnty. Juv. Severance Action No. S-114487*, 179 Ariz. 86, 94 (1994).  In fact, applying it in this context could promote perverse outcomes—most notably, defendants who, as a result of their evasion of parental responsibilities, are not death-penalty-eligible for murdering their biological children. We therefore hold that in capital cases, proof of biological parenthood is sufficient to establish that a parent-child relationship existed for purposes of evaluating whether a murder is especially heinous or depraved.

¶50        Robinson's constitutional objection to including fetuses in the parent-child relationship is similarly unconvincing.  As the trial court observed below, the (F)(9) aggravator refers to a fetus as "an unborn child." § 13-751(F)(9).  Indeed, the broader capital sentencing scheme is replete with similar references.  *See* §§ 13-701(D)(10), -704(M), -705(N), - 751(A), (F)(9), (H), -1104(A)–(C), and -1105(A)(1), (C); *see also Infanticide*, Black's Law Dictionary (11th ed. 2019) ("In archaic usage, the word referred also to the killing of an unborn child.").  It follows that, at least for present purposes, the legislature intended to treat a fetus, not as distinct from, but as *a type of* child.  Such plain statutory language necessarily alleviates any concerns about "serious constitutional problems" with the jury's (F)(6) finding here.  *See Carlson*, 202 Ariz. at 585 ¶ 55.  No "case-by-case expansion" of the aggravator is required to uphold the jury's conclusion that biological paternity established the requisite relationship between Robinson and B.H.  *Cf. id.* at 584–85 ¶ 55 ("In this case, dealing with a woman and her mother-in-law, we believe it unwise to expand the concept of relationship as an aggravating factor.").  Though we are prohibited from engaging in such ad hoc expansion, the legislature, as it did here, remains free to "enact and define reasonable and narrowing aggravating circumstances that apply, across the board, to all cases."  *Id.* at 585 ¶ 55.  By referring to fetuses as unborn children, the legislature, not this Court, has provided for their inclusion in the parent-child relationship.  The jury's finding that such a relationship existed here accordingly stands.

b.        *Senselessness and double counting*

¶51        The legislature's decision to equate feticide with infanticide also makes B.H.'s murder senseless as a matter of law.  *See Leteve*, 237 Ariz. at 527 ¶ 36; *see also Stanley*, 167 Ariz. at 528 ("The killing of a helpless child is senseless and demonstrates a disregard for human life satisfying two of the five [(F)(6)] factors.").  Whether Robinson killed B.H. to avoid his parental responsibilities makes no difference — in fact, the prosecutor made the same observation at closing.  And the absence of a separate, distinct physical injury to B.H. bears little import to the murder's senselessness, which depends upon the murder's relationship to Robinson's goal.  *See Carlson*, 202 Ariz. at 584 ¶ 52.

¶52        Robinson's double-counting argument is misplaced.  Although the jury was prohibited from weighing B.H.'s age twice as it "assesse[d] aggravation and mitigation" at the penalty phase, it was permitted to "use one fact to find multiple aggravators" at the aggravation phase. *See State v. Velazquez*, 216 Ariz. 300, 307 ¶ 22 (2007).  The trial court instructed the jury to that effect below.  The jury presumably followed these

instructions; the prosecutor did not counsel the jury to the contrary; and Robinson offers no evidence suggesting any such double counting occurred. *See id.* at 307–08 ¶¶ 23–24. We therefore affirm its (F)(6) finding as to B.H.'s murder.

### C.     The Life Imprisonment Instruction

**¶53**     Robinson next challenges the trial court's rejection of his proposed instruction defining life imprisonment in favor of what he calls a legally flawed final instruction. We review for abuse of discretion the court's refusal to give Robinson's requested instruction, *see State v. Dann*, 220 Ariz. 351, 363–64 ¶ 51 (2009), and we review de novo the legal accuracy of its given instruction, reading it "as a whole to ensure that the jury receives the information it needs to arrive at a legally correct decision," *Prince*, 226 Ariz. at 536 ¶ 77 (quoting *State ex rel. Thomas v. Granville*, 211 Ariz. 468, 471 ¶ 8 (2005)).

**¶54**     The trial court gave the jury the following instruction at the close of the penalty phase:

<u>**DEFINITION OF LIFE IMPRISONMENT**</u>

Any verdict of life imprisonment or death must be unanimous. Your decision is not a recommendation. If your verdict is that Defendant should be sentenced to death, he will be sentenced to death. If your verdict is that Defendant should be sentenced to life, he will be sentenced to life, and the Court will sentence him either to life in prison without the possibility of release or life in prison with the possibility of release after 25 years for Count 1 and 35 years for Count 2. The Court will make the decision of whether Defendant will receive life in prison without the possibility of release or life in prison with the possibility of release after 25 years or 35 years, respectively.

"Life without the possibility of release" means exactly what it says. The sentence of life without possibility of release from prison means the Defendant will never be eligible to be released from prison for any reason for the rest of the Defendant's life.

A defendant sentenced to life with the possibility of release after 25 years for Count 1 and/or 35 years for Count 2 must serve the entire 25 years before applying for release on Count

1 and must serve the entire 35 years before applying for release on Count 2. There is no automatic release after 25 years or 35 years. Arizona law no longer provides for parole. Defendant's only option is to petition the Board of Executive Clemency for release. If that Board recommends to the Governor that Defendant should be released, then the Governor would make the final decision regarding whether Defendant would be released.

Robinson's requested instruction would have said, "'Life in prison' means that the defendant will spend the remainder of his natural life in prison."

¶55 The trial court rejected Robinson's requested instruction. More specifically, the court rejected Robinson's argument that the Supreme Court's decisions in *Simmons v. South Carolina*, 512 U.S. 154 (1994), and *Lynch v. Arizona* (*Lynch II*), 578 U.S. 613 (2016) (per curiam), require a simple "life means life" instruction. Instead, it found that the final instruction's discussion of the two types of life sentences, as well as the executive clemency process, satisfied both decisions by giving the jury "an accurate statement of the law." We agree.

¶56 In *Simmons*, the Supreme Court held that, where a defendant's future dangerousness is at issue, and the only available alternative to a death sentence is life imprisonment without possibility of parole, due process "plainly requires" that the defendant be given an opportunity to inform the jury of his parole ineligibility via either a jury instruction or counsel argument. 512 U.S. at 168–69 (plurality opinion); *accord Kelly v. South Carolina*, 534 U.S. 246, 248 (2002); *Rushing*, 243 Ariz. at 221 ¶ 37. This so-called *Simmons* instruction aims to prevent juries from imposing a death sentence based on the misbegotten notion that a life sentence really means the defendant will eventually be paroled. *See* 512 U.S. at 170–71.

¶57 The threshold question, therefore, is whether Robinson was entitled to such an instruction. We conclude that he was. Because the State does not dispute it, we treat the future dangerousness precondition as met for purposes of this appeal. The parole ineligibility precondition is also satisfied. In Arizona, only individuals who committed a felony prior to January 1, 1994, and juvenile offenders are eligible for parole. A.R.S. § 41-1604.09. Robinson is neither. Absent some future legislative reform, his only hope of release had he received a life sentence would have been executive clemency. *See* § 13-751(A). Granted, under our originally narrow reading of *Simmons*, the lingering possibility of release via executive clemency would have obviated the need for an instruction on Robinson's

ineligibility for parole. *See State v. Lynch* (*Lynch I*), 238 Ariz. 84, 103 ¶ 65 (2015) (rejecting requirement to give parole ineligibility instruction where executive clemency made future release possible), *rev'd*, 578 U.S. 613.

**¶58** In *Lynch II*, the Supreme Court reversed our decision in *Lynch I* and held that neither the possibility of executive clemency nor the potential for future legislative reform could justify a trial court's refusal to give a parole ineligibility instruction. 578 U.S. at 615–16; *accord Simmons*, 512 U.S. at 166 (plurality opinion) ("To the extent that the State opposes even a simple parole-ineligibility instruction because of hypothetical future developments [such as legislative reform, commutation, clemency and escape], the argument has little force."); *id.* at 177 (O'Connor, J., concurring) (noting that the state may respond to a parole ineligibility argument or instruction by presenting "truthful information regarding the availability of commutation, pardon, and the like"). The upshot: an enduring possibility of "release" by a means other than parole does not negate a defendant's right under *Simmons* to a parole ineligibility instruction. *Lynch II*, 578 U.S. at 615–16. Where, as here, both preconditions are met, due process directs the trial court to inform the jury of a defendant's ineligibility for parole. *See id.*

**¶59** The remaining question is whether Robinson received his constitutional due. We conclude he did. In describing a sentence of "life with the possibility of release after 25 years for Count 1 and/or 35 years for Count 2," the trial court instructed the jury that "[t]here is no automatic release after 25 or 35 years," that "Arizona law no longer provides for parole," and that Robinson's "only option" for release would be to prevail on a petition for executive clemency, which would require both a recommendation by the Board of Executive Clemency and approval by the Governor. We conclude that this instruction gave the jury the necessary information to arrive at a legally sound decision. *See* (*James C.*) *Johnson*, 247 Ariz. at 184 ¶¶ 36–37 (affirming almost-identical instruction).

**¶60** Neither *Simmons* nor *Lynch II* supports Robinson's proposed instruction. Instead of informing the jury of the unavailability of parole as the trial court's final instruction did, his proposed instruction would have told the jury that a life sentence meant Robinson spending nothing less than "the remainder of his natural life in prison." But that would have overstated the effect of parole ineligibility. Having no chance of parole does not automatically terminate one's eligibility for other forms of release. Executive clemency is one such option. Had the jury returned a verdict of life imprisonment and the trial court imposed a release-eligible sentence, Robinson's ineligibility for parole would not have prevented him from

applying for executive clemency. Robinson's instruction would have left jurors with the false impression that no such options exist. We have rejected similarly sweeping instructions in the past. *See, e.g.*, *State v. Boyston*, 231 Ariz. 539, 552–53 ¶¶ 67–68 (2013) (rejecting proposed instruction that life imprisonment meant defendant "would be sentenced to natural life and would 'never be eligible to be released from prison for any reason for the rest of his life'"). We do so again here.

**¶61** *Simmons* and its progeny likewise fail to support Robinson's suggestion that the jury required a detailed comparison of parole and clemency. While perhaps not "obviously clear to a layperson," such distinctions bear little relation to *Simmons*'s ameliorative aims. As the plurality there observed, the impetus for a parole ineligibility instruction was public ignorance, not of what parole is, but of when it is available. "For much of our country's history, parole was a mainstay of state and federal sentencing regimes, and every term (whether a term of life or a term of years) in practice was understood to be shorter than the stated term." *Simmons*, 512 U.S. at 169. This reality left a seemingly indelible mark on the public's perception of prison terms. Even as legislatures, including our own, later enacted sentencing laws limiting its availability, parole's historic association with "life imprisonment" proved a pesky taint to purge from jurors' minds as they deliberated whether to impose the death penalty or a life sentence. A *Simmons* instruction disabuses jurors of this flawed presumption of parole eligibility by explicitly notifying the jury of an allegedly dangerous defendant's ineligibility for parole. *See id.* at 170–71. It does not, however, entitle that defendant to an instruction comparing parole to other forms of release for which he might still be eligible.

**¶62** In sum, Robinson rightly argues that he was entitled to a *Simmons* instruction. And that is precisely what he received. The trial court did not err in refusing the more sweeping instruction Robinson requested, and its final instruction correctly stated the law.

### D. The Statutory Narrowing Challenge

**¶63** We also reject Robinson's challenge to Arizona's capital sentencing scheme. He argues that the statutory aggravators fail to adequately narrow the class of death-eligible defendants in violation of the Eighth and Fourteenth Amendments to the United States Constitution. As Robinson himself acknowledges, we rejected this argument in *State v. Hidalgo*, 241 Ariz. 543, 551–52 ¶¶ 25–28 (2017), *cert. denied*, 138 S. Ct. 1054 (2018). And we have declined multiple invitations to revisit its holding. *See State v. Allen*, 248 Ariz. 352, 367 ¶ 56 (2020) (aggravator narrowing challenge

foreclosed by *Hidalgo*); *State v. Riley*, 248 Ariz. 154, 195–97 ¶¶ 171–80 (2020) (same); (*James C.*) *Johnson*, 247 Ariz. at 179 ¶¶ 7–8 (same); *State v. Champagne*, 247 Ariz. 116, 139 ¶ 72 (2019) (same); *State v. Acuna Valenzuela*, 245 Ariz. 197, 224 ¶ 121 (2018) (same). *Hidalgo* "remains binding precedent"; therefore, for the reasons explained there, we reject Robinson's argument here. *See Riley*, 248 Ariz. at 197 ¶ 179.

### E. The Prosecutorial Error Objections

¶64 Robinson next argues that the prosecutor engaged in "persistent and pervasive misconduct" that deprived him of due process and a fair trial. We will reverse a conviction due to prosecutorial error only if "(1) misconduct is indeed present; and (2) a reasonable likelihood exists that the misconduct could have affected the jury's verdict, thereby denying defendant a fair trial." *Smith*, 250 Ariz. at 99 ¶ 138 (quoting *State v. Anderson*, 210 Ariz. 327, 340 ¶ 45 (2005)). "[W]e review objected-to claims for harmless error and unobjected-to claims for fundamental error." *State v. Hulsey*, 243 Ariz. 367, 388 ¶ 88 (2018). Typically, we review each alleged incident individually for error, after which we decide whether the cumulative effect of any errors we find "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *State v. Payne*, 233 Ariz. 484, 511 ¶ 106 (2013) (quoting *State v. Hughes*, 193 Ariz. 72, 79 ¶ 26 (1998)).

#### 1. Leading and demonstrative questioning

¶65 Robinson first claims the prosecutor erred in examining Dr. Hu by asking leading questions about the timing of S.H.'s death and giving a demonstration of how Robinson might have held S.H.'s neck while applying the duct tape. The trial court sustained Robinson's objections to the questioning and demonstration, held a bench conference, and admonished the prosecutor as follows:

> First of all, it's not really appropriate for you to be doing a demonstrative exhibit like that display of how you think the crime may have occurred. There's really no evidence of exactly that, so, you know, you're bordering on being very argumentative with that type of a question.

> And you're continually leading the witness. He is your witness. You need to ask him open-ended questions or stop questioning him, one of the two.

. . . .

26

[As to how Robinson placed the duct tape on S.H.], you can ask the question, open-ended question, non-leading question. I'm going to continue to sustain leading questions . . . . I don't care if it's 4:30 or 5:30; you don't get to lead your own witness.

The court refused Robinson's request for a mistrial, however. Addressing the prosecutor's demonstration, the court explained:

I don't think it was unfairly prejudicial in the scheme of this case because we do know that the victim had duct tape applied; someone applied it. I think it's fair to assume that it wasn't probably done in a very gentle pattern, and that's really what the demonstration by [the prosecutor] showed.

¶66 On appeal, Robinson casts the prosecutor's actions as a deliberate effort "to steer" Dr. Hu's testimony in the State's favor and "to inflame the jurors and call attention to matters they should not consider" by showing the brutality of Robinson's actions. Counsel generally may not lead his or her own witness on direct. Ariz. R. Evid. 611(c). Though not an absolute prohibition, courts usually will permit leading questioning only "as necessary to develop the witness's testimony," *id.*, or "when doing so will serve 'the ends of justice,'" *Payne*, 233 Ariz. at 513 ¶ 119 (quoting *State v. King*, 66 Ariz. 42, 49 (1947)). Counsel is similarly restricted from referring to or effectively testifying about matters not in the record. *Acuna Valenzuela*, 245 Ariz. at 216–17 ¶ 71.

¶67 Robinson overstates the extent to which the prosecutor led Dr. Hu on direct regarding the timing of S.H.'s death. Only three of the six questions listed in Robinson's brief pertain to that issue.[12] Of those three, two were raised on redirect examination in response to testimony elicited by Robinson's trial counsel on cross. One occurred on direct.

---

[12] The State understates the number of questions regarding the timing of S.H.'s death. The prosecutor's question regarding when Dr. Hu's report says S.H. was last seen the day of the murder was part of a line of questioning about how Dr. Hu came to change his opinion about S.H.'s time of death. As for the other three questions listed by Robinson, one was objected to on grounds other than leading, and the other two were addressed to different issues—namely, the difficulty of inflicting defensive wounds when restrained and the means by which Robinson physically restrained S.H.

¶68     We do not doubt the legal impropriety of the prosecutor's questions and actions. The trial court's decision to sustain Robinson's objections and eventually to admonish the prosecutor demonstrates as much. Yet Robinson does not explain how such impropriety rises to the level of prosecutorial error. His briefing omits any evidence suggesting the prosecutor asked leading questions or deviated from matters in the record with the requisite "indifference, if not a specific intent, to prejudice" Robinson. *See Lynch I*, 238 Ariz. at 100 ¶ 51 (quoting *Gallardo*, 225 Ariz. at 570 ¶ 46). He instead insists the prosecutor's malintent was "obvious" and "clear," and that the prosecutor's "words and actions" in examining Dr. Hu "permeated the trial with unfairness as to make the resulting conviction a denial of due process." But that is not enough. *See Payne*, 233 Ariz. at 513 ¶ 120 (finding "no evidence that the prosecutor deliberately misframed questions").

¶69     The prosecutor did not direct the jury's attention to matters outside the record. Two leading questions were asked on redirect in response to an issue raised by Robinson's counsel on cross. The one posed on direct asked whether Dr. Hu's first opinion on the timing of S.H.'s death had accounted for the factors he credited for his changed opinion—factors that Dr. Hu had already identified by that point in his testimony. Additionally, although inappropriate, the prosecutor's demonstration did not introduce anything new. By then, the jurors had already learned about the duct tape wrapped around S.H.'s face and neck. Indeed, it was defense counsel on cross who first elicited testimony from Dr. Hu that the marks on S.H.'s neck—marks that Dr. Hu had attributed to strangulation—possibly could have been inflicted while her killer was "stabilizing" S.H.'s body to apply the duct tape. Thus, as the trial court itself observed, it was not unfounded for the prosecutor to suggest the tape was not applied gently.

## 2.     Penalty phase closing statements

¶70     We are even less concerned with the prosecutor's penalty phase closing arguments. Robinson says the prosecutor "repeatedly told the jurors that they had to find a nexus between [his] actions and the mitigation," causing the jury to disregard evidence of his tragic childhood. Had that happened—or had the trial court excluded mitigation evidence on this basis—that would likely constitute error. We have long held that no such nexus is required before a jury may consider mitigation evidence. *Newell*, 212 Ariz. at 405 ¶ 82. But neither the prosecutor nor the court told the jury such a connection was required.

**¶71** Not once during closing argument did the prosecutor suggest that, absent a causal nexus to the murders, the jury could not rely on Robinson's childhood experiences as mitigation. In fact, the opposite is true. The prosecutor repeatedly reminded the jury that no such nexus was needed. The prosecutor did say that "[a]ny connection or lack of connection may impact the quality and strength of the mitigation evidence," that "[i]f there isn't a link to the offense or the crime, that can affect the quality and strength of the mitigation evidence," and that "nothing that [Robinson] did in this case is related to [his hometown] or his background or his culture." None of this was error. The prosecutor was free to downplay the impact of Robinson's childhood on his moral culpability for S.H.'s and B.H.'s murders—an argument that goes to the weight of Robinson's mitigation, not to its admissibility. *See State v. Villalobos*, 225 Ariz. 74, 83 ¶ 39 (2010) ("[T]he state may fairly argue that the lack of a nexus to the crime diminishes the weight to be given alleged mitigation."); *State v. Pandeli* (*Pandeli II*), 215 Ariz. 514, 526 ¶ 32 (2007) ("[T]he State never told jurors that they could not consider mitigation unrelated to the crime; it merely suggested that such mitigation was entitled to minimal weight."); *Anderson*, 210 Ariz. at 350 ¶ 97 ("Once the jury has heard all of the defendant's mitigation evidence, there is no constitutional prohibition against the State arguing that the evidence is not particularly relevant or that it is entitled to little weight."). Thus, no error, much less fundamental error, occurred here.

**¶72** In any event, the jury instructions cured any such error. The trial court told the jury it could consider any relevant evidence as mitigation, that it need not find a causal nexus, that it "must disregard" any contrary instruction, and that it "must give independent consideration" to all of Robinson's mitigation. These instructions adequately remedied any error during closing arguments. *See Pandeli II*, 215 Ariz. at 526 ¶ 33.

### F. Independent Review

**¶73** In addition to those issues Robinson raises, we independently review the "findings of aggravation and mitigation and the propriety of the death sentence." A.R.S. § 13-755(A); *see also State v. Morris*, 215 Ariz. 324, 340 ¶¶ 75–76 (2007). Because Robinson murdered S.H. and B.H. after August 1, 2002, we review these findings for an abuse of discretion. *See* § 13-756(A); 2002 Ariz. Sess. Laws ch. 1, § 7(C) (5th Spec. Sess.).

#### 1. Aggravating circumstances

**¶74** Substantial evidence reasonably supports the jury's findings as to the remaining aggravators. *See Morris*, 215 Ariz. at 341 ¶ 77. Robinson

was convicted of two serious offenses—arson of an occupied structure and kidnapping, *see* § 13-751(F)(2); he was convicted of the two concurrently committed homicides of S.H. and B.H., *see* § 13-751(F)(8); and he was twenty-one years old when he murdered B.H., an unborn child, *see* § 13-751(F)(9). Therefore, the jury did not abuse its discretion in finding each aggravator proven beyond a reasonable doubt.

## 2. Imposition of the death penalty

**¶75** Nor did the jury err in returning a death verdict. Even after accounting for Robinson's abusive childhood home, violent hometown, and generational poverty, the jury did not abuse its discretion in concluding that such evidence was not sufficiently substantial to call for leniency. *See State v. Naranjo*, 234 Ariz. 233, 250 ¶ 89 (2014). We therefore affirm.

## G. Issues Preserved to Avoid Preclusion

**¶76** Robinson raises several challenges to Arizona's death penalty to preserve for federal review. As Robinson himself acknowledges, we have already considered and rejected each of them, and, although he invites us to revisit our earlier decisions, he offers no substantive argument in support of their reversal, much less the "special justification" we normally require. *See State v. Hickman*, 205 Ariz. 192, 200 ¶ 37 (2003).

**¶77** We have previously held (1) that the death penalty does not per se constitute cruel and unusual punishment, *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59 (2001), *vacated on other grounds*, 536 U.S. 953 (2002); (2) that where, as here, a defendant offers no evidence of purposeful discrimination in his own case, he cannot argue that Arizona's death penalty is discriminatorily imposed against poor, young, and male defendants, *State v. Stokley*, 182 Ariz. 505, 516 (1995); (3) that the prosecutor's discretion to seek the death penalty is not unconstitutional for lack of adequate standards, *State v. Sansing*, 200 Ariz. 347, 360–61 ¶ 46 (2001), *vacated on other grounds*, 536 U.S. 954 (2002); (4) that proportionality review of a death sentence is not constitutionally required, *id.*; (5) that the absence of a proof requirement as to death's propriety does not render Arizona's death penalty statute constitutionally defective, *id.*; (6) that the death penalty statute's allowance for death where the jury finds one or more aggravator and no mitigation is not unconstitutionally arbitrary, *Pandeli I*, 200 Ariz. at 382 ¶ 88; (7) that the statute provides adequate guidance for balancing aggravating and mitigating factors, *id.* ¶ 90; (8) that execution by lethal injection is not cruel and unusual punishment, *Lynch I*, 238 Ariz. at 105 ¶ 77; (9) that it falls within the trial court's discretion to refuse questioning about

specific mitigating circumstances during voir dire, *State v.* (*Ruben M.*) *Johnson*, 212 Ariz. 425, 434–35 ¶¶ 29–35 (2006); (10) that victim impact statements relevant to harm caused by a defendant's criminal acts are constitutionally permissible, *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 17 (2003); (11) that the death penalty statute does not unconstitutionally fail to require cumulative consideration of multiple mitigating factors or specific findings as to each, *Sansing*, 200 Ariz. at 361 ¶ 46; and (12) that international standards do not compel the death penalty's abolition, *State v. Ross*, 180 Ariz. 598, 602 (1994). We decline to revisit those holdings here.

### III. CONCLUSION

¶78        For the reasons above, we affirm Robinson's convictions and sentences.